Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 1039 | DATE | 3/25/2003 |
| CASE TITLE | Gregory L. Scott vs. Pace Suburban Bus | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: there is no genuine issue of material fact on the Title VII claims Plaintiff Scott asserts against Defendant Pace. Defendant is entitled to judgment as matter of law. Accordingly, its motion for summary judgment is granted. This is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAR date docketed 2003 | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 64 |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | | |
| ✓ | Copy to judge/magistrate judge. | | | |
| TBK courtroom deputy's initials | | 03 MAR 25 PM 3:07 Date/time received in central Clerk's Office | date mailed notice  mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY L. SCOTT,           )
                            )
       Plaintiff,           )
                            )
v.                          )     No. 01 C 1039
                            )     Paul E. Plunkett, Senior Judge
PACE SUBURBAN BUS,          )
                            )
       Defendant.           )

*MEMORANDUM OPINION AND ORDER*

Gregory Scott ("Scott") has sued Pace Suburban Bus ("Pace") for alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Pace has filed a Federal Rule of Civil Procedure 56(c) motion for summary judgment. For the reasons set forth below, the motion is granted.

*Facts*

Unless otherwise noted, the following facts are undisputed. Pace Suburban Bus, a unit of local government, is responsible for providing public transportation by bus throughout Chicago's six-county suburban region. (Def.'s LR 56.1(a) Stmt. ¶ 4.) Gregory Scott, an African-American, was hired by Pace's South Division in April 1994 as a bus operator. (*Id.* ¶ 3.) He became a dispatch supervisor in December 1996 and served in that position until he was fired on August 21, 2000. (*Id.*) During

Scott's tenure as a dispatch supervisor, ten other South Division employees held the position of dispatch supervisor. (*Id.* ¶ 21.) Five of them were African-American. (*Id.*)

A dispatch supervisor is assigned to perform either as a road supervisor or as a dispatcher. (*Id.* ¶ 13.) When acting as a road supervisor, a dispatch supervisor conducts field operations out on the road, such as monitoring the performance of bus operators and investigating passenger incidents, accidents and vehicle break-downs. (*Id.*) When acting as a dispatcher, a dispatch supervisor remains on-site at a Pace garage, supervising and coordinating bus routes and bus operators, maintaining work assignment boards, operating the base radio, coordinating route detours and communicating with local authorities as needed. (*Id.*)

During his employment as a dispatch supervisor, Scott's own supervisors were Jerel Trennert, a Caucasian, and Greg Hawkins, an African-American. (*Id.* ¶ 14.) Pete Kommer, Pace's regional manager for the South Division, was the highest ranking employee at the South Division. (*Id.* ¶ 19.) Scott's job performance was evaluated by Hawkins. (*Id.* ¶ 16.) Pace's employee performance appraisal form lists ten discrete categories of evaluation. (*Id.* ¶ 17; Hawkins Dep. Ex. 10.) On Scott's 1999 appraisal form, covering the 1999 calendar year, Scott's performance was rated "below position requirements" in two of the ten areas. (Def.'s LR 56.1(a) Stmt. ¶ 16; Hawkins Dep. Ex. 10.) In the other eight areas, Scott's performance was rated "meets position requirement." (Hawkins Dep. Ex. 10.) Scott's overall performance was rated "meets position requirements". (*Id.*)

On August 17, 2000, Joyce Boyd, a Pace bus operator, met with Kommer and told him that on August 15, 2000, Scott was waiting for her at approximately 12:54 p.m. at the Homewood Park & Ride. (Def.'s LR 56.1(a) Stmt. ¶ 59; Def.'s Ex. 25.) Boyd told Kommer she felt intimidated and harassed by Scott. (Def.'s LR 56.1(a) Stmt. ¶ 59.) This conversation prompted Kommer to ask

Hawkins to retrieve Scott's daily report[1] and system-route check log[2] for that date. (*Id.* ¶60.) After Hawkins reviewed Scott's records, Hawkins reported to Kommer that Scott's records were not consistent with Scott's whereabouts for that day. (*Id.* ¶ 64.) Scott's daily report did not indicate that he was at the Homewood Park & Ride at all on August 15. (Def.'s Ex. 21.) It indicated that between 12:30 p.m. and 12:40 p.m. Scott was "en route to 153rd Park" and that between 12:40 p.m. and 2:20 p.m. he was at "153rd Park." (*Id.*) Kommer was told by a Pace employee that Scott announced to other dispatch supervisors that Scott caught Boyd running late at the Homewood Park & Ride. (Def.'s LR 56.1(a) Stmt. ¶ 67.)

Scott was at the Homewood Park & Ride between 12:30 p.m. and 12:40 p.m. on August 15. (Scott Dep. 93-94.) Scott's daily report did not reflect this fact because, although he was "in the vicinity" of the Park & Ride, Scott was ordered by a dispatcher to go to the intersection of 153rd and Park to investigate a malfunctioning railroad gate. (Pl.'s Ex. D ¶ 23.) He listed his location as "en route" because he never actually got out of his car at the Park & Ride. (*Id.*)

Scott's route check log indicated that Scott saw five buses leaving the Pace facility between 6:07 a.m. and 6:09 a.m. (Def.'s Ex. 22.) Hawkins told Kommer that Hawkins saw Scott at approximately 6:05 a.m. on August 15 going through a nearby White Castle fast food drive-thru in a supervisor's car. (Def.'s LR 56.1(a) Stmt. ¶ 65.) Hawkins also told Kommer that Hawkins arrived at the Pace facility at approximately 6:15 a.m. that day, and that Scott entered the facility's parking lot after him. (*Id.*) Hawkins told Kommer that Scott's route check log could not be correct. (Def.'s LR 56.1(a) Stmt. ¶ 66.)

---

[1] A daily report contains a chronology of the dispatch supervisor's activities for a given day.

[2] A route check log lists specific bus route numbers indicates whether the bus operators arrive at certain checkpoints along their routes at the expected times.

Certain of Scott's daily report and route check log entries for August 15, 2000, were not accurate. (Scott Dep. 89, 97, 100-01, 191.) Scott testified that he did not receive proper training on how to complete a daily report and that he completed it to the best of his ability. (Scott Dep. 97, 99, 101, 191.) Scott was fired on August 21, 2000 by Kommer. (*Id.* ¶ 68.) Kommer made the decision himself to terminate Scott. (*Id.* ¶ 69.) He based his decision on the inaccuracies in Scott's daily report brought to his attention by Hawkins and Boyd, and Scott's own statement to Pace employees that Boyd arrived at the Homewood Park & Ride late. (*Id.* ¶¶ 72, 74, 75.) Kommer told Melinda Metzger, Kommer's immediate supervisor, that he was going to terminate Scott, but Kommer did not consult with anyone else at Pace. (*Id.*) Scott's immediate supervisor, Trennert, was present as a witness when Kommer fired Scott. (Pl.'s LR 56.1(b) Stmt. ¶ 44.) On August 23, 2000, Scott filed a notice of charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination in violation of Title VII. (Def.'s Ex. 1.)

Scott filed a complaint against Pace, alleging racial discrimination in employment (Count I) and retaliatory discharge (Count II). Pace filed a motion for summary judgment on both counts.

### *The Legal Standard*

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Illinois,*

*Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

## *Discussion*

### *I. Count I - Employment Discrimination*

Scott alleges that, in violation of Title VII, Pace fired him because of his race and that during the last twenty months of his employment with Pace, Pace discriminated against him because of his race in a variety of ways.

Title VII prohibits employment discrimination on the basis of race, color, religion, sex or national origin. 42 U.S.C.A. § 2000e-2 (1994). Some Title VII claims may be time-barred, however, if a plaintiff does not file a charge with the EEOC within the statutory time period – 180 days in this case. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (discussing the statutory time period within which a plaintiff must file a charge with the EEOC). Scott filed his charge of discrimination with the EEOC on August 24, 2000. Therefore, any alleged discriminatory acts of Pace that occurred prior to February 23, 2000 are time-barred.

Scott's claims regarding suspensions and reprimands are time-barred; they occurred in 1997. His claims regarding certain requests to take personal and vacation days, including time off to attend Pace Day at the Races, are also time-barred. So too is his claim relating to the completion of a job survey. The claims that are not time-barred, and the claims we will address here, are: (1) the comment of "you people" by Trennert; (2) the personal errands Scott ran for his supervisors; (3) the denial of requested time-off for the July 4, 2000 holiday; (4) the denial of desirable shifts; and (5) Scott's termination.

To defeat Pace's motion, Scott must present either direct evidence of Pace's discriminatory intent or prove intent via the burden-shifting method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Scott has no direct evidence of discriminatory intent and so we proceed under the *McDonnell Douglas* burden-shifting analysis.

The *McDonnell Douglas* analysis requires that, for each of Scott's claims, Scott first demonstrate that he has a *prima facie* case of discriminatory treatment. He must show that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he suffered an adverse employment action; and (4) similarly situated persons not in the protected class were treated more favorably. *See Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 742-43 (7th Cir. 1999). If he succeeds, the burden of production shifts to Pace to offer a legitimate, non-discriminatory reason for the adverse action. If Pace carries its burden, the burden then shifts back to Scott to show the proffered reasons for the adverse action are merely pretext. *See Von Zuckerstein v. Argonne Nat'l Lab.*, 984 F.2d 1467, 1472 (7th Cir. 1993). The ultimate burden to prove discrimination always remains with Scott. *See Sattar v. Motorola*, 138 F.3d 1164, 1169 (7th Cir. 1998).

There is no dispute that Scott has satisfied the first element, and so we focus on whether Scott's claims satisfy the remaining three elements of the *prima facie* case.

### *The Comment "You People"*

Scott claims that Trennert used the phrase "you people" to refer to a group of African-Americans and that this was discriminatory. Trennert stated in his deposition that the phrase was not one he used often, and that in any event, if he did use it, he was referring to dispatchers and supervisors as a group. (Trennert Dep. 66.) Tony Moore, an African-American supervisor dispatcher at Pace,

testified that Trennert may have used the term, but that Trennert was referring to supervisors and dispatchers and that Trennert's use of the phrase had never been discussed before at Pace. (Moore Dep. 25.) Even if this remark were racially charged, Scott has not offered any evidence to show that it was more than a stray remark and that the remark was related to any employment decision he now challenges. *See Fuka v. Thomsom Consumer Electronics*, 82 F.3d 1397, 1403-04 (7th Cir. 1996). Moreover, the making of this comment, even if it occurred more than once, does not, without more, constitute a hostile work environment. *See Filipovic v. K & R Express Sys. Inc.*, 176 F.3d 390, 398 (7th Cir. 1999).

### *Personal Errands*

Scott claims he was discriminated against because of his race when Trennert and Hawkins asked him to do personal errands for them. For example, Scott testified that Hawkins asked Scott to obtain a money order for him and to buy him cigarettes. (Scott Dep. 185-86.) When Scott traveled on business near a pet store, Trennert asked Scott to check the price of dog food and purchase a dog collar. (*Id.*) While perhaps inappropriate, these errands do not constitute adverse employment action. *See Johnson-Carter v. B.D.O. Seidman, LLP*, 169 F. Supp. 2d 924, 943 (N.D. Ill. 2001) ("performing a few tasks for a supervisor is a 'mere inconvenience' rather than an adverse employment action").

In addition, Scott is not able to prove that similarly situated individuals not in the protected class received more favorable treatment. He testified that Mary Ann Pandak and Nigel Murry, both Caucasian dispatch supervisors, were also asked to run personal errands such as buying food. (Scott Dep. 188.) Scott has not brought to our attention any evidence to suggest these errands were more than inconveniences and were requested of him because of his race.

### *July 4, 2000 Holiday*

Scott claims that he was discriminated against because he was granted only two days off, rather than his requested three, around the July 4, 2000 holiday to attend an out-of-town family event. (Scott Dep. 35.) However, personnel documents from June and July 2000 show that Scott was off from June 27, 2000 through July 8, 2000, either as a result of vacation or a regularly-scheduled day off. (Def. Ex. 16.) Scott has not provided any evidence to suggest that similarly situated non African-Americans employees were treated more favorably with respect to scheduling during this holiday.

### *Denial of Favorable Shifts*

Scott maintains that, because of his race, he was denied weekday shifts and was required to work weekends. He makes his claim in general terms and does not compare himself with the required specificity to other similarly situated employees not in the protected class. *See Greer v. Board of Educ.*, 267 F.3d 723, 728 (7th Cir. 2001.) Personnel records for the months of June, July and August 2000 show that while Scott worked some night shifts and weekends, he also worked day shifts and had some weekends off. (Def.'s Ex. 16.) These records also show that some Caucasian dispatch supervisors worked night and weekend shifts. Scott has not made any argument or provided any evidence to demonstrate that these shift records are not representative of the usual shift assignments or are somehow misleading. The burden is on Scott to show that similarly situated non African-Americans were treated more favorably in their shift assignments. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000.) He has not met this burden.

*Termination*

We now come to what seems to be the focus of Scott's claims, that he was terminated because of his race. Under the *McDonnell Douglas* burden-shifting analysis, Scott must show that at the time of his termination, he was meeting his employer's legitimate performance expectations. Scott has submitted employee performance appraisals[3] to show he was meeting Pace's legitimate performance expectations. The most recent appraisal is for the 1999 calendar year. This does not help Scott because he was allegedly fired for falsifying his August 15, 2000 work records. Scott must have been meeting Pace's legitimate employment expectations at the time of his termination. *See Edwards v. Miller*, 2002 WL 1377683, *7 (N.D. Ill. June 25, 2002.)

Scott asserts that Boyd's allegations of sexual harassment, as well as other similar allegations made by other female co-workers, are being used by Pace as evidence that Scott was not meeting Pace's legitimate performance expectations. (Pl.'s Mem. Opp'n to Def.'s Mot. Summ. J. at 7.) In his brief and his Local Rule 56.1 statement of additional material facts, Scott attempts to show that he did not sexually harass Boyd. But what actually happened between Scott and Boyd is irrelevant; both Scott and Pace agree that Kommer did not fire Scott because of Boyd's allegations. (Pl.'s LR 56.1(b) Stmt ¶ 33.) In addition, Scott admits that Boyd told Kommer about Scott's presence at the Park & Ride on August 15. It is the fact that Boyd told Kommer about the event that is relevant because it prompted an inquiry into the accuracy of Scott's August 15 work records.

---

[3] We decline to adopt Pace's position that these documents, and certain others submitted by Scott, are inadmissible because of Federal Rule of Evidence 901. Certainly the provenance of Pace's own employee performance appraisals, some of which Pace itself has submitted in support of its motion, does not become suspect merely because Scott submits them in support of his response. Moreover, absent some reasonable indication that the authenticity of other documents submitted by Scott are suspect, we will not deem them inadmissible.

Scott must also show that other similarly situated non African-Americans were treated more favorably. A similarly situated employee is one who is "directly comparable in all material respects". *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (citing *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). He must be similarly situated "with respect to performance, qualifications, and conduct". *Radue*, 219 F.3d at 617-18.

Scott has not offered any specific examples of similarly situation non African-Americans who were treated more favorably with respect to similar conduct. He casually mentions that Chuck Foster and John LeBeau, two non African-Americans, were demoted rather than fired. However, Scott does not know the circumstances surrounding their demotions, (Scott Dep. 61-62), and accepts Pace's explanation of the reasons for their demotions. Scott knows of no other Caucasian employees who were accorded more favorable treatment. (Scott Dep. 61-64.) Kommer has terminated one Caucasian dispatcher supervisor for lying and falsifying documents, a fact Scott does not dispute. (Def.'s LR 56.1(a) Stmt. ¶ 84.)

The parties dispute whether Scott admitted to falsifying his daily report. Whether the inaccuracies were intentional on Scott's part or innocent mistakes is irrelevant because Scott has not provided any evidence to show that others who claimed to have made innocent mistakes in record-keeping were treated more favorably. The fact remains that Scott's daily report was inaccurate, and Scott admitted this. (Scott Dep. 98-100.) Falsifying records is a legitimate reason for termination. (Trennert Dep. Ex. 7.)

Scott has not met his burden under *McDonnell Douglas* of demonstrating a *prima facie* case of discrimination. Even if Scott were successful, he cannot show that Pace's reason for terminating Scott is pretext.

To demonstrate pretext, Scott must show that Pace's articulated reason for the demotion is "unworthy of credence", *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888 (7th Cir. 2001), or "a lie, . . . a phony reason." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). "[P]retext means deceit used to cover one's tracks." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002) (citing *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001)). It is irrelevant that the inaccuracies in Scott's daily report may have been innocent mistakes. As long as Pace believes that it fired Scott because Scott falsified his work records, Scott cannot meet his burden. *See Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001.) Scott has failed to carry his burden to show that there exists an issue of triable fact as to whether his termination, or any of the other complained of employment practices, were motivated by race.

## II. Count II - Retaliatory Discharge

Scott also claims that Pace fired him in retaliation for his 1999 anonymous complaint to the Illinois Department of Labor ("Labor Department") about Pace's alleged failure to adhere to the meal break and rest requirements of Illinois's One Day Rest in Seven Act, 820 ILCS 140/1-9. It is not clear from Scott's pleadings and briefs whether he intends makes this claim under Title VII or under state law. Scott has not asserted 28 U.S.C. § 1367 (supplemental jurisdiction) as a basis for jurisdiction, so we proceed under the assumption that Scott intends to make out this claim under Title VII.[4]

To establish a *prima facie* Title VII retaliatory discharge claim, Scott must show that he engaged in protected activity, he suffered an adverse employment action and there is a causal link

---

[4] This Court has no opinion on whether Scott may have a state law claim for retaliatory discharge. If Scott's intention was to assert a state law claim, pursuant to 28 U.S.C. § 1367(c), we decline to exercise supplemental jurisdiction.

between the two. *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998). Scott cannot satisfy this requirement.

Generally, an employee who opposes his employer's unlawful employment practices, specifically those employment practices made unlawful by Title VII itself, engages in "protected activity". 42 U.S.C. § 2000e-3. Scott's complaint to the Labor Department is not a "protected activity" under Title VII because Pace's alleged violation of the Illinois law is not an unlawful employment practice under Title VII. Scott's filing of his EEOC complaint is also not a "protected activity" under these circumstances because his termination occurred prior to, and not as a result of, the filing of his EEOC complaint.

### *Conclusion*

For the reasons set forth above, there is no genuine issue of material fact on the Title VII claims Scott asserts against Pace. Pace is entitled to judgment as matter of law. Accordingly, its motion for summary judgment is granted. This is a final and appealable order.

**ENTER:**

_____
**UNITED STATES DISTRICT JUDGE**

DATED: 3/25/03